966 F.2d 820
 1993 A.M.C. 1276
 UNITED STATES FIRE INSURANCE COMPANY; Transerve Marine,
Incorporated, Plaintiffs-Appellees,
v.
ALLIED TOWING CORPORATION, Defendant-Appellant,
United States of America, Defendant & Third Party, Plaintiff-Appellee,
and
TUG STARCRESCENT, her engines, tackle, etc., in rem, Defendant,
The TANK BARGE TMI 96, her engines, tackle, etc., in rem,
Third Party Defendant.
UNITED STATES FIRE INSURANCE COMPANY; Transerve Marine,
Incorporated, Plaintiffs-Appellants,
v.
ALLIED TOWING CORPORATION, Defendant-Appellee,
United States of America, Defendant & Third Party Plaintiff-Appellee,
and
TUG STARCRESCENT, her engines, tackle, etc., in rem, the
Tank Barge TMI 96, her engines, tackle, etc., in
rem, Defendants.
UNITED STATES FIRE INSURANCE COMPANY; Transerve Marine,
Incorporated, Plaintiffs-Appellees,
v.
ALLIED TOWING CORPORATION, Defendant-Appellee,
United States of America, Defendant & Third Party Plaintiff-Appellant,
and
TUG STARCRESCENT, her engines, tackle, etc., in rem, the
Tank Barge TMI 96, her engines, tackle, etc., in
rem, Defendants.
 Nos. 90-1871, 90-1879 and 90-1882.
 United States Court of Appeals,
Fourth Circuit.
 Argued Feb. 4, 1992.
Decided May 21, 1992.
 
 Morton H. Clark, Vandeventer, Black, Meredith & Martin, Norfolk, Va., argued. (Daniel R. Warman, Williams, Worrell, Kelly, Greer & Frank, Norfolk, Va., on brief), for defendant-appellant.
 Craig S. English, Chalos, English & Brown, New York City, James Patrick Jacobsen, Trial Atty., Civ. Div., U.S. Dept. of Justice, Washington, D.C., argued Stuart M. Gerson, Asst. Atty. Gen., Civ. Div., U.S. Dept. of Justice, Washington, D.C., Kenneth E. Melson, U.S. Atty., Norfolk, Va., for plaintiffs-appellees.
 Before WILKINSON and LUTTIG, Circuit Judges, and OSTEEN, United States District Judge for the Middle District of North Carolina, sitting by designation.
 OPINION
 LUTTIG, Circuit Judge:
 
 
 1
 This admiralty case arises out of a collision involving a tug, a tow, and a Navy ship. Following the collision, the owner of the tow and its insurance company filed suit against the owner of the tug and the United States. The district court found both the tug and the Navy ship at fault for the collision and apportioned liability equally between the owner of the tug and the United States. The court awarded damages, but declined to award prejudgment interest. The defendants appeal the district court's apportionment of liability and its damages award. The plaintiffs appeal the district court's refusal to award prejudgment interest. We affirm the apportionment of liability, vacate the damages award and the denial of the motion for prejudgment interest, and remand the case to the district court.
 
 I.
 
 2
 In the early morning of March 24, 1989, the USS MOUNT BAKER, a Navy ammunition ship, collided with the TMI-96, an unmanned tank barge owned by Transerve Marine, Inc. ("Transerve Marine"). At the time of the collision, the USS MOUNT BAKER was engaged in a search and rescue mission near the Chesapeake Bay with four other Coast Guard and Navy ships. The TMI-96 was transporting fertilizer from the Gulf of Mexico to Virginia, and was in tow of the STARCRESCENT, a tugboat owned by Allied Towing Corporation ("Allied Towing"). Both the USS MOUNT BAKER and the TMI-96 sustained damages in the collision.
 
 
 3
 The TMI-96 was insured by United States Fire Insurance Co. ("U.S. Fire"). Transerve Marine recovered $482,000 from U.S. Fire following the collision,[1] and then sold the TMI-96. Thereafter, U.S. Fire filed a subrogation claim against the STARCRESCENT, Allied Towing, and the United States.[2] Allied Towing answered U.S. Fire's complaint and filed a cross-claim against the United States. The United States answered the complaint and filed cross-claims against Allied Towing and the STARCRESCENT.
 
 
 4
 Transerve Marine then filed an intervening complaint, seeking to recover the costs of repairs beyond those covered by its insurance policy with U.S. Fire. Allied Towing and the United States answered this complaint as well, and the United States filed a counterclaim against Transerve Marine.
 
 
 5
 On October 9, 1990, following a five-day bench trial, the district court found both the STARCRESCENT and the USS MOUNT BAKER at fault for the collision, and apportioned liability equally between Allied Towing and the United States. The court found that at the time of the collision the USS MOUNT BAKER was not making proper use of its radar, was not sounding fog signals, and was travelling at an excessive speed. As for the STARCRESCENT, the court found that its use of a 2000-foot tow line was unnecessarily risky; that it failed to make proper use of its radar, was not sounding fog signals, and was travelling at an excessive speed; and that the captain of the tug did not attempt to make radio contact with the USS MOUNT BAKER. The court found that the TMI-96 was not at fault.
 
 
 6
 On the issue of damages, the district court concluded that U.S. Fire was entitled to a recovery of $482,000, the amount of its payment to Transerve Marine; that the United States was entitled to recover $267,642.68 as compensation for the damages sustained by the USS MOUNT BAKER; and that Transerve Marine was entitled to recover expenses in the amount of $66,331. The court ordered that Allied Towing and the United States split the total amount of damages (approximately $816,000). The court later denied U.S. Fire and Transerve Marine's motion for prejudgment interest, on the grounds that Transerve Marine's officers were partially responsible for the collision.
 
 
 7
 Both in personam defendants and both plaintiffs appeal. One of the defendants (Allied Towing) challenges the district court's apportionment of liability, and both defendants claim that the damages award was excessive. Both plaintiffs claim that the district court erred in declining to award prejudgment interest.
 
 
 8
 We conclude that the district court's apportionment of liability was not clearly erroneous, but that the court failed to provide an explanation for its damages award sufficient to permit meaningful appellate review, and abused its discretion in declining to award prejudgment interest on the grounds that Transerve Marine's officers were partially responsible for the collision. We therefore affirm in part, vacate in part, and remand so that the district court may reconsider its damages award and reconsider whether an award of prejudgment interest is appropriate.
 
 II.
 
 9
 Allied Towing appeals the district court's apportionment of liability and its finding that the TMI-96 was not at fault for the collision. Both of these determinations are reviewed for clear error. McAllister v. United States, 348 U.S. 19, 20, 75 S.Ct. 6, 7-8, 99 L.Ed. 20 (1954); Ente Nazionale Per L'Energia Electtrica v. Baliwag Navigation, Inc., 774 F.2d 648, 653-54 (4th Cir.1985).
 
 A.
 
 10
 Allied Towing claims that the collision was caused solely by the negligent navigation of the USS MOUNT BAKER, and that the district court therefore erred in apportioning fault equally between the STARCRESCENT and the USS MOUNT BAKER. The gravamen of Allied Towing's claim is that the district court clearly erred in finding that the STARCRESCENT was not sounding fog signals prior to the collision.
 
 
 11
 The captain, the mate, and the deckhand on watch aboard the STARCRESCENT all testified that the tugboat was sounding fog signals prior to the collision, and several lookouts aboard the USS MOUNT BAKER testified that they had heard fog signals from another vessel prior to the collision. The district court did not believe this testimony, and instead credited the testimony of the STARCRESCENT's engineer, who testified that the tug's foghorn was not operating prior to and at the time of the collision. Allied Towing's claim regarding the sounding of the foghorn thus amounts to a claim that the district court was clearly erroneous in choosing to believe the crew member of the STARCRESCENT who testified that the foghorn had not sounded, rather than the crew members who testified that it had sounded.
 
 
 12
 Because this determination by the district court was based upon assessments of witness credibility, it is deserving of the highest degree of appellate deference. See Anderson v. City of Bessemer City, 470 U.S. 564, 575, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985) ("[W]hen a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error."). The trial court is uniquely qualified to determine which witnesses are most credible and to resolve conflicts among witnesses' testimony, for the simple reason that it has the benefit of observing the witnesses, and is thereby "aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." Id.; see J.A. at 697 (district court stated that STARCRESCENT engineer's "manner and appearance on the witness stand" supported his "truthfulness"). Against this exceedingly deferential standard of review, we cannot conclude that the district court clearly erred in deciding to credit the testimony of the STARCRESCENT engineer--who was in a position to know whether the foghorn could have sounded--over the contradictory testimony of crew members of the STARCRESCENT and USS MOUNT BAKER.[3] Because the district court did not clearly err in finding that the STARCRESCENT was not sounding fog signals prior to the collision, we affirm the district court's equal apportionment of liability between the STARCRESCENT and the USS MOUNT BAKER.[4]
 
 B.
 
 13
 Allied Towing also contends that the district court erred in finding that the TMI-96 was not at fault for the collision. In support of this contention, it argues that it was a statutory violation for the TMI-96 not to have its lights on at the time of the collision, given the weather conditions, and that the so-called Pennsylvania Rule therefore applies. According to the Pennsylvania Rule, when
 
 
 14
 a ship at the time of a collision is in actual violation of a statutory rule intended to prevent collisions, ... the burden rests upon the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been.
 
 
 15
 The Pennsylvania, 86 U.S. (19 Wall.) 125, 136, 22 L.Ed. 148 (1874). Allied Towing argues that Transerve Marine did not meet the burden imposed by the Pennsylvania Rule to prove that TMI-96's fault "could not have been" the cause of the collision.[5] Even assuming that the TMI-96 was in violation of a maritime rule as a result of its failure to display its navigational lights during the fog,[6] we believe that Transerve Marine successfully rebutted the presumption that this violation was a cause of the collision. The district court found that it would not have made "one iota of difference one way or the other whether the [TMI-96's] navigation lights were or were not on," J.A. at 697, and that "the lack of navigation lights on the barge ... would [not] have served to prevent any amount of damage," id. at 699. This finding was based in turn on an apparent finding that the fog was so dense immediately preceding the crash that the crew of the USS MOUNT BAKER would have been unable to see the TMI-96's navigational lights even had they been illuminated.[7] There is no basis upon which we could conclude that either finding was clearly erroneous, and together they are sufficient to satisfy the burden imposed on Transerve Marine to prove that the TMI-96's failure to have its lights on could not have been a cause of the collision. See Hellenic Lines, Ltd. v. Prudential Lines, Inc., 730 F.2d 159, 162 (4th Cir.1984); see also Alter Barge Line, Inc. v. TPC Transp. Co., 801 F.2d 1026, 1029 (8th Cir.1986) (violator of navigational statute may not be held liable under Pennsylvania Rule if other party to accident is found to be sole cause); Otto Candies, Inc. v. M/V Madeline D, 721 F.2d 1034, 1036 (5th Cir.1983) (same).
 
 III.
 
 16
 The United States appeals the district court's damages award,[8] claiming that the court's valuation of the TMI-96 was erroneous. A district court's damages award is reviewed under a clearly erroneous standard. E.I. DuPont de Nemours & Co., Inc. v. Robin Hood Shifting & Fleeting Serv., Inc., 899 F.2d 377, 379 (5th Cir.1990); Scott v. Vandiver, 476 F.2d 238, 243 (4th Cir.1973).
 
 
 17
 The district court found that the cost of the repairs required by the TMI-96 as a result of the collision exceeded the value of the barge at the time of the collision. It thus concluded that the TMI-96 was a "constructive total loss" and that recovery should be limited to the TMI-96's value at the time of the collision, minus salvage value. See In re LeBeouf Bros. Towing Co., Inc., 588 F.Supp. 130, 131 (E.D.La.1984). The district court adopted the insured value of the barge as the barge's value at the time of the collision for purposes of its damages calculation.
 
 
 18
 The United States claims that the district court erred in relying upon the TMI-96's insured value ($500,000), and should instead have used as the measure of the vessel's value the depreciated cost of reconstructing the barge, minus the cost of needed pre-collision repairs. This amount, according to the United States, is $155,000.[9]
 
 
 19
 A court may permissibly value a vessel for which a market value is not ascertainable by relying upon any number of methodologies, including the vessel's replacement cost depreciated; expert opinion regarding the value of the vessel; the earning capacity of the vessel; and the amount for which the vessel was insured. See Carl Sawyer, Inc. v. Poor, 180 F.2d 962, 963 (5th Cir.1950); see also Standard Oil Co. v. Southern Pacific Co., 268 U.S. 146, 156, 45 S.Ct. 465, 467, 69 L.Ed. 890 (1925) ("The ascertainment of value is not controlled by artificial rules. It is not a matter of formulas, but there must be a reasonable judgment having its basis in a proper consideration of all relevant facts."); Ozanic v. United States, 165 F.2d 738, 740 (2d Cir.1948) ("There is no one fixed basis which is decisive where a free and open market for such ships does not exist to establish fair market value. Rather, the basis of valuation is a composite one which gives an end result in each instance approximating actual value as closely as possible."); Grant Gilmore & Charles L. Black, Jr., The Law of Admiralty § 7-18, at 524 (2d ed. 1975) (when market value of vessel cannot be ascertained, valuation "often reflects a miscellany of considerations, with some rough sense of approximate justice coagulating the mass to a firm figure"). Reconstruction cost depreciated is not the "sole guide" to valuation. Standard Oil, 268 U.S. at 156, 45 S.Ct. at 467.
 
 
 20
 In this case, the district court heard testimony on several of the aforementioned methodologies before it settled on the insured value of the TMI-96 as the best measure of the vessel's value. The United States concedes that insured value generally is an appropriate measure of a vessel's value. Its argument is that in this particular case insured value cannot represent the actual value of the TMI-96, because the barge's insured value was never adjusted between 1985 and the date of the collision to reflect the decrease in the value of the barge due to its deteriorating condition.
 
 
 21
 We are not prepared to conclude that the district court clearly erred in adopting the insured value as the value of the TMI-96 at the time of the collision.[10] Contrary to the United States' assertion, the fact that the barge was in need of repairs in the amount of $403,000 does not necessarily establish that the actual value of the barge was not $500,000 at the time of the collision. It is possible, for example, that an amount for repair costs that would be incurred before the next valuation was factored into the insured value of the barge in 1985, although two valuation reports completed at the time the barge was insured suggest that this may not have been the case. See J.A. at 882 (report dated January 15, 1985 stated that TMI-96's "present day condition" supported value of approximately $500,000 (emphasis added)); id. at 875 (report dated December 12, 1985 stated that barge's "[e]stimated current market value" was $500,000 (emphasis added)). It is also possible that the barge was underinsured in 1985. In fact, there is evidence in the record to support this possibility. Bruce Law testified that because of its earning capacity, the barge, as of 1985, was worth more than the $500,000 for which it was insured. Id. at 623-24; see Hewlett v. Barge Bertie, 418 F.2d 654, 658 (4th Cir.1969) ("If there is no market value, other indicia of value must be looked to. Among other factors is the use value to the owner." (citations omitted)), cert. denied, 397 U.S. 1021, 90 S.Ct. 1261, 25 L.Ed.2d 531 (1970).[11] It is even possible that the vicissitudes of the market were such that the value of barges in general, and the TMI-96 in particular, increased between 1985 and 1989 in an amount that would offset the cost of any needed repairs. It does not appear that any evidence on the market value of barges in general was introduced by any of the parties.
 
 
 22
 If future repair costs were factored into the 1985 insured value, if the TMI-96 was underinsured in 1985, if the market value of barges increased between 1985 and 1989, or if any of these events occurred in combination, the barge might well have been worth the $500,000 insured value at the time of the collision.[12] The district court, however, did not make findings with respect to any of these possibilities. Absent these or similar kinds of findings, we simply cannot determine how the court reconciled its finding that the TMI-96 was worth in 1989 the amount for which it was insured in 1985 with the apparently undisputed evidence that the barge was in need of more than $400,000 worth of repairs at the time of the collision.
 
 
 23
 The district court found that "[t]he deterioration in th[e] vessel was extremely bad at the time of the collision," J.A. at 701; that "the maintenance in ... 1989 ... would have exceeded $300,000 easily," id. at 702; that "we were approaching the time when we were going to watch the whole thing just fall apart unless something were done," id.; that the insurance value was set "when the heavy costs of repair ... [were] not anticipated," id. at 704; that the barge "couldn't have been used but for a few more voyages at best," id. at 705; and that "the vessel was in pretty bad shape," id. at 706. The court also stated that the cost of insurance is generally what the owner believes the value of its vessel is, "at least at the time of the obtaining of the insurance contract." Id. at 703 (emphasis added). Although, for the reasons we have mentioned, these findings are not necessarily inconsistent with a finding that the TMI-96's insured value in 1985 is the best measure of its actual value in 1989, without further explanation one could only conclude that these findings are inconsistent with a finding that the barge was worth $500,000. Cf. Complaint of North American Trailing Co., 763 F.Supp. 152, 161 (E.D.Va.1991) (value of vessel reduced by cost of needed precollision repairs).
 
 
 24
 The ascertainment of a vessel's value need only be a "reasonable judgment." Standard Oil, 268 U.S. at 156, 45 S.Ct. at 467. That judgment, however, must be based upon "a proper consideration of all relevant facts." Id. As the record presently exists, the district court's explanation of its valuation decision leaves us uncertain as to whether that requirement has been satisfied. We therefore have no choice but to vacate the district court's damages award, and to remand the case so that the court may either provide an explanation for its choice of insured value or recalculate the damages award.
 
 IV.
 
 25
 U.S. Fire and Transerve Marine appeal the district court's denial of their motion for prejudgment interest. The court declined to award prejudgment interest because it determined that Transerve Marine was partially responsible for the collision. The court imputed partial fault to Transerve Marine because its officers and directors, acting in their capacities as officers and directors of Allied Towing, decided not to repair the winch on the STARCRESCENT until the tug and the TMI-96 reached Virginia.[13] The consequence of this decision was that the TMI-96 was towed on a tow line that was longer than advisable.
 
 
 26
 "Under maritime law, the awarding of prejudgment interest is the rule rather than the exception, and, in practice, is well-nigh automatic." Reeled Tubing, Inc. v. M/V Chad G, 794 F.2d 1026, 1028 (5th Cir.1986); accord Noritake Co., Inc. v. M/V Hellenic Champion, 627 F.2d 724, 728 (5th Cir. Unit A 1980) ("As a general rule, prejudgment interest should be awarded in admiralty cases--not as a penalty, but as compensation for the use of funds to which the claimant was rightfully entitled."). A district court, however, may decline to award prejudgment interest when "peculiar circumstances" would render such an award inequitable. Orduna S.A. v. Zen-Noh Grain Corp., 913 F.2d 1149, 1157 (5th Cir.1990).[14] While a district court has latitude to deny prejudgment interest, we are constrained to conclude that the district court in this case abused its discretion in declining to award prejudgment interest on the particular grounds on which it relied.
 
 A.
 
 27
 The district court's finding that there were "peculiar circumstances" present rested on its conclusion that Transerve Marine was partially responsible for the collision. This conclusion was in turn based solely upon the fact that Transerve Marine and Allied Towing effectively have identical officers and directors. The court, therefore, essentially pierced Transerve Marine's corporate veil, holding it responsible for the inaction of its officers and directors in their capacities as Allied Towing's officers and directors. See J.A. at 719 (district court stated that "Transerve [Marine] is very much an alter ego of Allied Towing").
 
 
 28
 Any number of considerations--for example, gross undercapitalization of the subservient corporation, siphoning of funds by the dominant corporation, failure to observe corporate formalities, and the absence of corporate records--may in any given case weigh in favor of piercing the corporate veil. Keffer v. H.K. Porter Co., Inc., 872 F.2d 60, 65 (4th Cir.1989); Cheatle v. Rudd's Swimming Pool Supply Co., Inc., 234 Va. 207, 360 S.E.2d 828, 831 (1987). The corporate veil, however, may not be pierced solely because of an overlap (or even identity) of corporate officers and directors. See Crown Cent. Petroleum Corp. v. Cosmopolitan Shipping Co., 602 F.2d 474, 476 (2d Cir.1979) (sister corporations are entitled to presumption of separateness despite common ownership); Zaist v. Olson, 154 Conn. 563, 227 A.2d 552, 558 (1967) ("[W]hen the corporation functions as an entity in the normal manner contemplated and permitted by law ..., there is nothing insidious in ... interlocking directorates or identity of officers."); see also Washington & Old Dominion Users Ass'n v. Washington & Old Dominion R.R., 208 Va. 1, 155 S.E.2d 322, 325-26 (1967). Here, the only asserted basis for piercing Transerve Marine's corporate veil was the identity of officers and directors between Transerve Marine and Allied Towing. The district court did not find that Transerve Marine's officers and directors, acting in their capacities as Transerve Marine's officers and directors, were in any way responsible for Allied Towing's failure to repair the winch.
 
 
 29
 Because the identity of officers and directors between Transerve Marine and Allied Towing is alone insufficient to permit the piercing of the corporate veil, and no other justification for piercing the veil appears in the record, the district court erred in finding Transerve Marine partially at fault for the collision. It follows from our conclusion that the district court erred in this predicate finding that the court abused its discretion in denying the plaintiffs' motion for prejudgment interest on the basis of this finding. See Ameejee Valleejee & Sons v. M/V Victoria U., 661 F.2d 310, 313 (4th Cir.1981) (district court's refusal to award prejudgment interest is reviewed under abuse of discretion standard). We therefore vacate the district court's denial of the motion for prejudgment interest.[15]
 
 B.
 
 30
 The district court issued its ruling on the plaintiffs' motion for prejudgment interest in a written order filed six days after the court announced its findings regarding liability and damages from the bench. The plaintiffs, however, had originally moved for an award of prejudgment interest orally, immediately after the court announced its findings in open court. At that time, the court suggested that it was disinclined to award prejudgment interest because it would be inequitable, given their equal liability, for Allied Towing but not the United States to be required to pay such an award.[16] On the assumption that the district court may reasonably be expected to return to the disparate effect of a prejudgment interest award on Allied Towing and the United States as an alternative ground for denying the plaintiffs prejudgment interest, we have considered whether "equal liability, unequal damages" can, in the context of this case, constitute a "peculiar circumstance" justifying a district court's decision not to award prejudgment interest. We conclude that it cannot.
 
 
 31
 The disparate effect of a prejudgment interest award on a nongovernmental party and the United States as joint tortfeasors is wholly the product of the doctrines of joint and several tort liability and sovereign immunity. While prejudgment interest is "part of full and fair compensation to the injured party," Ameejee Valleejee & Sons, 661 F.2d at 313, the plaintiff may not recover prejudgment interest from the United States because the United States has not waived its sovereign immunity with respect to such an award. We do not believe that the disproportionate impact on a private joint tortfeasor that arises from the natural application of settled doctrines such as sovereign immunity and joint liability can constitute a "peculiar circumstance" justifying the denial of prejudgment interest. This result is no more peculiar than that that would obtain had the United States not waived its sovereign immunity even as to damages.
 
 
 32
 It follows from our rejection of disparate effect as a "peculiar circumstance" that, should the district court decide to award prejudgment interest, the nongovernmental tortfeasor (here, Allied Towing) will be responsible for 100 percent of the prejudgment interest, rather than only 50 percent, its proportional share of liability. The Fifth and Eighth Circuits reached a similar conclusion in the context of an analogous statutory provision, and we find their reasoning persuasive. See Transorient Navigators Co. S.A. v. M/S Southwind, 788 F.2d 288 (5th Cir.1986); SCNO Barge Lines, Inc. v. Sun Transp. Co., 775 F.2d 221 (8th Cir.1985). Transorient Navigators and SCNO Barge Lines held that in suits brought under the Suits in Admiralty Act, 46 U.S.C. app. §§ 741-752, which limits the United States' payment of prejudgment interest to a 4 percent rate, see id. § 743, and permits the interest to run only from the date of the suit (rather than from the date of the collision), see id. § 745, the nongovernmental tortfeasor is responsible for payment of all of the prejudgment interest, except so much as the United States is statutorily permitted to pay. A contrary result, as those courts explained, would be inconsistent with the principle that prejudgment interest is an element of damages and that a plaintiff may recover full damages from any one of two or more joint tortfeasors. See Transorient Navigators, 788 F.2d at 293-95; SCNO Barge Lines, 775 F.2d at 227-28. Here, suit was brought under the Public Vessels Act, which precludes recovery of any prejudgment interest from the United States. Allied Towing, therefore, is responsible for 100 percent of any prejudgment interest that the district court awards.
 
 CONCLUSION
 
 33
 For the foregoing reasons, we conclude that the district court's apportionment of liability was not clearly erroneous, but that the court failed to justify its valuation for purposes of its damages award and abused its discretion in denying the plaintiffs' motion for prejudgment interest on the particular grounds upon which that denial rested. The judgment of the district court accordingly is affirmed in part, vacated in part, and remanded for reconsideration of the damages award and reconsideration of whether an award of prejudgment interest is appropriate.
 
 
 34
 AFFIRMED IN PART, VACATED IN PART, AND REMANDED.
 
 
 
 [1]
 The $482,000 recovery represented the difference between the value of Transerve Marine's insurance policy ($500,000) and the TMI-96's salvage value ($18,000)
 
 
 [2]
 The United States has waived its sovereign immunity in suits "for damages caused by a public vessel of the United States." 46 U.S.C. app. § 781
 
 
 [3]
 The testimony of the STARCRESCENT's engineer was supported by the testimony of at least three crew members of the USS MOUNT BAKER, each of whom testified that he did not hear any fog signals from the STARCRESCENT prior to the collision
 
 
 [4]
 The court's finding that the captain of the STARCRESCENT did not attempt to make radio contact with the USS MOUNT BAKER prior to the collision also rested upon judgments about the credibility of witnesses. We decline to disturb this finding for the same reason that we leave undisturbed the court's finding regarding the sounding of the foghorn
 
 
 [5]
 The Pennsylvania Rule is not "a hard and fast rule that every vessel guilty of a statutory fault has the burden of establishing that its fault could not by any stretch of the imagination have had any causal relation to the collision, no matter how speculative, improbable, or remote." Compania De Maderas De Caibarien, S.A. v. The Queenston Heights, 220 F.2d 120, 122-23 (5th Cir.), cert. denied, 350 U.S. 824, 76 S.Ct. 52, 100 L.Ed. 736 (1955); accord Gele v. Chevron Oil Co., 574 F.2d 243, 248 (5th Cir.1978) (Pennsylvania Rule cannot be "pressed to literal extremes"); States Steamship Co. v. Permanente Steamship Corp., 231 F.2d 82, 87 (9th Cir.1956) (phrase "could not have been" in The Pennsylvania means that vessel that has violated statutory rule must prove that violation "could not reasonably be held to have been a proximate cause of the collision")
 
 
 [6]
 Rule 24 of the International Regulations for Preventing Collisions at Sea, for example, requires a vessel in tow to display certain lights, and Rule 20 provides that the lights prescribed by the Rules must be displayed not only from sunset to sunrise but also from sunrise to sunset "in restricted visibility." 33 U.S.C. foll. § 1602
 
 
 [7]
 The district court's explanation for its finding that the TMI-96's failure to display lights was not a cause of the collision is less than clear. The court stated that the absence of lights was not a cause of the collision
 because of the method of the fog itself. It was dense over the tugboat, and not immediately as dense over the Navy vessel. But it was rolling in.
 J.A. at 700; see also id. at 694 ("The Court finds that the fog was rolling in from the east, and somewhat from the north as the wind indicated."). We believe, however, that the most reasonable inference to be drawn from this description of the fog and its movement is that the court found that the fog over the tug and barge was so dense that the crew of the USS MOUNT BAKER would not have been able to detect the lights even had they been on. The correctness of this inference is supported by the fact that at least two witnesses testified that visibility at the time of the collision was nearly zero. See id. at 108, 150.
 
 
 [8]
 The United States concedes that the district court's apportionment of liability was not clearly erroneous. See United States' Br. at 5
 
 
 [9]
 Bruce Law, the president of Transerve Marine, testified that the TMI-96 needed $403,000 worth of repairs prior to the collision in order to meet U.S. Coast Guard and American Bureau of Shipping requirements. The United States' expert witness testified that the barge's depreciated replacement cost was $558,000. The United States arrived at the $155,000 figure by subtracting the $403,000 from the $558,000
 
 
 [10]
 The United States claims that the district court's damages award should be reviewed under a de novo standard, because it was undisputed that the TMI-96 was in need of $403,000 worth of repairs prior to the collision. The damages award, however, is a function of the value of the barge, and the value of a vessel, like the value of any real or personal property, is a question of fact. See, e.g., Anselmo v. Commissioner, 757 F.2d 1208, 1213 (11th Cir.1985); United States v. Terry, 729 F.2d 1063, 1066 (6th Cir.1984); Pennsylvania Ave. Dev. Corp. v. One Parcel of Land, 670 F.2d 289, 293 (D.C.Cir.1981). Factual determinations, of course, are reviewed only for clear error
 
 
 [11]
 Mr. Law testified that the TMI-96 generated an average of $389,000 a year for Transerve Marine between 1984 and 1988, and that the barge's "track record" was the best of all Transerve Marine's vessels. J.A. at 626
 
 
 [12]
 Even the United States' proposed valuation method, reconstruction cost depreciated, might yield a value of $500,000. Calculating a vessel's reconstruction cost depreciated almost inescapably involves a high degree of both subjectivity and approximation, see Standard Oil, 268 U.S. at 158, 45 S.Ct. at 467-68 ("It was shown that annual rates of depreciation used in the accounts of shipowners varied from two and a half to five per cent., and that such rates are affected by the policy of the owners, business conditions, taxes and other things."); Complaint of North American Trailing Co., 763 F.Supp. 152, 157-58 (E.D.Va.1991) (one expert witness used five percent depreciation rate, another used four percent rate), and a slightly lower rate of depreciation would have significantly increased the value of the TMI-96. The United States' expert witness arrived at his $558,000 figure by using a five percent rate. On cross examination, however, the witness conceded that had he used a four percent rate, the value of the barge would have been $913,495. J.A. at 467-68. Subtracting $403,000 from this amount would have yielded a value of just over $500,000, the value upon which the district court ultimately settled
 It might even be the case that depreciation takes into account the cost of needed repairs. If this is true, use of the five percent rate would support a valuation of approximately $500,000.
 
 
 [13]
 Transerve Marine and Allied Towing effectively have identical ownership, boards, and management. As the district court stated in its order denying the plaintiffs' motion for prejudgment interest,
 Kirk Woodruff and William Law are the directors of Allied Marine Corp., which wholly owns Allied Towing, and together with Law's four sons own 90% of the stock in Allied Marine. The same six own 100% of Transerve's stock, and three of Law's sons are Transerve's directors.
 J.A. at 719.
 
 
 [14]
 Typical examples of "peculiar circumstances" are an unwarranted delay in bringing suit, a damages award substantially less than that sought, a genuine dispute regarding liability, complex legal and factual issues, and a bad faith claim. See Nunley v. M/V Dauntless Colocotronis, 863 F.2d 1190, 1204 (5th Cir.1989); Phillips Petroleum Co. v. Stokes Oil Co., Inc., 863 F.2d 1250, 1258 (6th Cir.1988); see also Orduna S.A., 913 F.2d at 1157 ("equitable considerations which caution against an award" may also constitute "peculiar circumstances"). In some circuits "mutual fault"--i.e., fault on the part of the plaintiff as well as the defendant--constitutes a "peculiar circumstance." Compare Inland Oil & Transport Co. v. Ark-White Towing Co., 696 F.2d 321, 328-29 (5th Cir.1983) (mutual fault may be "peculiar circumstance") with Alkmeon Naviera, S.A. v. M/V Marina L, 633 F.2d 789, 798 n. 12 (9th Cir.1980) (mutual fault is not "peculiar circumstance")
 
 
 [15]
 Because we conclude that there is no factual basis in the record for the district court's finding that Transerve Marine was partially at fault for the collision, we reject Allied Towing's claim that that finding requires that Transerve Marine's percentage of fault be determined, and the collision damages apportioned accordingly. For the same reason, we need not address Transerve Marine and U.S. Fire's claim that "mutual fault" can never constitute a "peculiar circumstance" justifying denial of prejudgment interest
 
 
 [16]
 Under the Public Vessels Act, 46 U.S.C. app. §§ 781-790, a plaintiff may not recover prejudgment interest from the United States. Id. § 782